## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

BILLIE ANNA DAVENPORT,                  :
                                         :
             Plaintiff              :
                                         :
          v.                        :        Civ. No. 14-828-LPS
                                         :
CAROLYN W. COLVIN, Acting               :
Commissioner of Social Security,        :
                                         :
             Defendant.             :

Gary C. Linarducci, LINARDUCCI & BUTLER, PA, New Castle, DE.

    Attorney for Plaintiff.

Charles M. Oberly, III, United States Attorney, and Heather Benderson, Special Assistant United States Attorney, OFFICE OF THE GENERAL COUNSEL, Philadelphia, PA.

Nora Koch, Acting Regional Counsel, Naomi Mendelsohn, Assistant Regional Counsel, Dina White Griffin, SOCIAL SECURITY ADMINISTRATION, Philadelphia, PA.

    Attorneys for Defendant.

### MEMORANDUM OPINION

March 22, 2016
Wilmington, Delaware

**STARK, U.S. District Judge:**

## I.     INTRODUCTION

Plaintiff Billie Anna Davenport ("Davenport" or "Plaintiff") appeals from a decision of Defendant Carolyn W. Colvin, the Acting Commissioner of Social Security ("Commissioner" or "Defendant"), denying her application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Title II of the Social Security Act, 42 U.S.C. §§ 401-34; 1381-83. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

Pending before the Court are cross-motions for summary judgment filed by Davenport and the Commissioner. (D.I. 7, 12) Davenport asks the Court to remand Defendant's decision. (D.I. 7) Defendant requests that the Court affirm the decision denying Plaintiff's application for benefits. (D.I. 13) For the reasons set forth below, the Court will grant Plaintiff's motion and deny Defendant's motion.

## II.    BACKGROUND

### A.     Procedural History

Davenport filed her applications for SSI and DIB on March 21, 2006. (D.I. 4 ("Tr.") 40) Davenport alleged that her disability began on March 15, 2003. (*Id.* at 22) The application was denied in September 2006 and was denied again on March 30, 2007. (*See* D.I. 4 Ex. 1) Davenport filed a written request for a rehearing. On October 24, 2007, a hearing was held before an administrative law judge ("ALJ"), who issued a decision finding that Davenport was disabled after July 18, 2007, but that she was not disabled before that date. (*See* Tr. 86-103) Davenport filed a request for review by the Appeals Council, and on February 26, 2010, the Appeals Council vacated the decision with respect to the finding of nondisability and remanded

1

the case to the ALJ.  (Tr. 104-07)  On March 2, 2011, the ALJ issued another finding of

nondisability.  (Tr. 30-31)  On September 11, 2012, the Appeals Council denied Davenport's

request for review.  (Tr. 14-18)

On June 26, 2014, Davenport filed a Complaint seeking judicial review of the ALJ's

March, 2011 decision.  (D.I. 1)  Davenport moved for summary judgment on December 11,

2014.  (D.I. 7)  The Commissioner filed a cross-motion for summary judgment on February 9,

2015.  (D.I. 12)

### B.    Factual Background

#### 1.    Plaintiff's Medical History, Treatment, and Conditions

Davenport was forty-eight years old when she applied for DIB and SSI in March 2006.

(*See* Tr. 40, 44)  She has a high-school equivalent degree, which she obtained in Greece.  (Tr. 45)

Davenport is married and lives with her husband and her five year-old grandson.  (Tr. 45, 61)

She is a certified nursing assistant and has worked as a line machine operator and as a home

health aide.  (Tr. 278, 46-47)  Davenport has been unemployed since March 15, 2003.  (Tr. 46)

She asserts that her disability arises from asthma and from severe cervical and lumbar

degenerative disc disease.  (*See* D.I. 8 at 4-5)

The record contains treatment or other reports from the following physicians: Drs.

Sugarman (Tr. 758-805), Patil (Tr. 555-96, 921-37), Nash (Tr. 343-440), Cozamanis (Tr. 441-

554), Irgau (408-09), Lenhard (412-14), Leidig (Tr. 417-19), Elener (Tr. 597-671), Downing (Tr.

894-904), Richman (Tr. 941-72), and Chabalko (Tr. 364-65, 938).

Other professionals' interactions with Davenport or reviews of her medical history are

also part of the record before the Court.  These non-treating practitioners include Drs. Cruz, Kim,

2

Aldridge, and Borek, who performed consultative reviews of Davenport's medical records as part

of proceedings before the Social Security Administration.  (Tr. 749-55, 806, 978-88, 1023-42)

### a.      Disc Damage, Joint Disease, and Back Pain

Davenport was involved in a motor vehicle accident in October 2002.  (Tr. 46-47)  An

MRI following the accident showed a subtle disc herniation compressing the S1 nerve root and a

central disc herniation at C5-6 with spinal stenosis.  (Tr. 592)  A later MRI showed degenerative

disc disease at L3-4, L4-5, and L5-S1.  (Tr. 803-04)  Shortly after her accident, Davenport started

treatment with Dr. Cozamanis, a chiropractor.  Throughout her treatment, Davenport consistently

reported feeling a "radiating pain" from her back to her limbs as well as persistent migraines.

(*See generally* Tr. 555-96, 758-805)  To help her deal with the pain, she was prescribed

OxyContin, which she took from at least May 2003 through October 2007 (when the bulk of the

records stop).  (Tr. 576, 921)  Davenport also received a series of epidural spinal injections.  (Tr.

578-86)  Because the spinal injections proved unsuccessful, Davenport's back specialist, Dr.

Patil recommended a neurosurgical consult.  (Tr. 571-78)

In early 2004, Davenport underwent an L3-S1 spinal fusion and had rods and screws

inserted into her lower back.  (Tr. 564, 790)  Although she felt better after her operation, she still

experienced severe, persistent back pains, and regular migraines.  (*Id.*)  Her condition continued

to deteriorate, and in early 2005 she underwent an anterior cervical discectomy with fusion at C5-

6.  (Tr. 775)  Immediately after the surgery, Davenport reported a marked improvement in her

condition.  "She denied any pain, numbness, or tingling radiating into the upper extremities."

(Tr. 775)

In May of 2005, however, Davenport reported that she experienced significant radiating

pain, that she was weak, and that she would consistently drop items. (Tr. 773) At around this time, Dr. Patil opined that "due to the heavy dose of narcotics [Davenport would not] be able to work around heavy machinery" and that "[s]he is clearly not in any position to return to gainful employment." (Tr. 557) Despite the pain Davenport experienced, her neurosurgeon, Dr. Sugarman, reported that Davenport was "doing well" and that Davenport's spine was in "excellent alignment." (Tr. 773)

In September 2006, Dr. Patil completed a disability form and indicated that Davenport "clearly has chronic residuals" from her injury and that "she is permanently disabled." (Tr. 555) Davenport's condition remained essentially the same from May 2005 through June 2006, when she had surgery to remove pedicle screws from L3 to S1. (Tr. 761-62) After this surgery, Davenport reported significant relief and demonstrated full motor control. (Id.) Two months later, she reported that she continued to have pain in her lower back. (Tr. 758)

In October 2007, Dr. Patil opined that Davenport "has severe, chronic, intractable lower back pain." (Tr. 921) Dr. Patil explained that "[s]he cannot sit for more than five minutes and she cannot [stand] for more than five minutes." (Id.) Finally, Patil concluded that the side effects of the OxyContin, in tandem with the severe pain, would preclude Davenport from working. (Id.)

### b.  Asthma

Davenport has a history of asthma and of chronic obstructive pulmonary disease. (Tr. 359) In 2002, a pulmonary function test showed a severe obstruction, leading her primary care physician, Dr. Nash, to conclude that she had "severe persistent asthma" and reduced lung function. (Tr. 360) There appear to be no other records pertaining to Davenport's asthma until

4

March 2007, when she was treated by Dr. Richman.  Davenport consulted with Dr. Richman,

complaining of an increased cough, fatigue, and weight loss.  (Tr. 963)  Dr. Richman noted that

her difficulties were caused, in part, by her asthma and prescribed an albuterol inhaler.  (*Id.*)

On December 2, 2010, Dr. Edwin Cruz reviewed Davenport's medical records and

evaluated whether Davenport suffered from a condition that met or exceeded the severity of

listing 3.02 from the Social Security Administration's Listing of Impairments.  (Tr. 1024-25)  Dr.

Cruz found that Davenport's asthma and respiratory disease did not meet or exceed the severity

of Listing 3.02.  (Tr. 1025)

### c.      Residual Functional Capacity

On September 24, 2006, Dr. M. H. Borek reviewed Davenport's medical records and

provided a Residual Functional Capacity ("RFC") assessment, summarizing all of the available

medical and examining source opinions.  Dr. Borek found that Davenport retained the ability to

occasionally lift or carry ten pounds, frequently lift or carry less than ten pounds, stand for at

least two hours a day, sit for six hours a day, and occasionally climb, stoop, kneel, crouch, and

crawl.  (Tr. 750-51)  Dr. Borek further found that Davenport had limited ability to push or pull

using her upper extremities, that she had no visual limitations, that she had a limited ability to

reach, and that she was unable to balance.  (*Id.*)  Dr. Borek's assessment was later reviewed and

affirmed, without comment, by Dr. Aldridge.  (Tr. 806)

On December 13, 2007, Dr. Yong K. Kim performed a medical evaluation and

examination of Davenport.  (Tr. 978)  Dr. Kim found that Davenport would be able to walk and

stand for four to six hours a day, sit for four to six hours a day, and lift from five to ten pounds.

(Tr. 980)

### 2.   The First Administrative Hearing

Davenport's first administrative hearing took place in Dover, Delaware on October 24, 2007. (Tr. 38)  Davenport was represented by counsel and participated from New Castle, Delaware via video conference. (Tr. 40, 90)

### a.   Plaintiff's testimony

Davenport testified that she is fifty years old, five feet six inches tall, and weighs about 193 pounds. (Tr. 44)  She attended high school in Greece and earned a high school degree. (Tr. 45)  She is married and lives with her five year-old grandson, of whom she has custody. (*Id.*)  Davenport holds a driver's license, but indicated she does not drive very far or very often. (Tr. 61)  Davenport testified that she had worked for Holly Steel Corporation as a line machine operator, where she was required to both sit and stand, and to lift over fifty pounds. (Tr. 46)  Immediately prior to the alleged onset of disability, she worked as a home health aide. (Tr. 47)  In this role, she assisted a patient by serving dinner and moving the patient from place to place. (*Id.*)

On October 12, 2002, Davenport was injured in a bus accident. (*See* Tr. 46-47)  Davenport testified that her injuries prevent her from working. (Tr. 48)  Specifically, she testified that she cannot lift anything over ten pounds and that her medications – including Oxycontin, Xanax, and muscle relaxers – prevent her from working. (*Id.*)  Davenport indicated that her most severe medical problem is her back pain. (Tr. 48)  She explained that she feels severe pain in her back when she wakes up and that her back pains last all day. (Tr. 49)  Because of the pain, she cannot go to the grocery store. (Tr. 50)  She expects to be on medication for the

6

rest of her life.  (*Id.*)

Davenport testified that her second most severe medical problem is her breathing disorders, specifically chronic obstructive pulmonary disease and asthma.  (Tr. 50-51)  She explained that she has used an asthma inhaler for years and that she takes oxygen with her everywhere she goes.  (Tr. 51)  Davenport further testified that she experiences fatigue and depression, as well as migraines, insomnia, panic attacks, neck pains, and numbness in her hands.  (Tr. 53-56)

When describing her functional capabilities, Davenport stated that she currently uses styrofoam dinnerware because she cannot hold normal plates.  (*See* Tr. 55)  Davenport further testified that she can feed and dress herself, but that her hands shake and she sometimes forgets how to spell.  (Tr. 56)  Davenport estimates that she can walk for about five minutes, that she rarely uses stairs, that she can stand for five to ten minutes at a time, and that she can sit for about twenty minutes at a time.  (Tr. 58-59)  She cannot easily bend at the waist.  (Tr. 59)  Davenport has a friend who does housework for her and her husband handles cooking duties.  (Tr. 60)

### b.      Vocational Expert's testimony

An independent vocational expert ("VE"), Jan Howard Reed, also testified at the hearing.  (Tr. 66-71)  The VE considered an individual with Davenport's onset age (forty-five), work experience, and level of education, who can perform jobs that are light, sedentary, and unskilled.  (Tr. 67)  The VE found that such a person would be able to work as a packer, inspector, cashier, security guard, assembler, or order clerk.  (Tr. 68)  When asked to consider the effect of medication on such an individual's ability to hold a job, the VE opined that work would be precluded if the individual's attentiveness were reduced by 10-15% or more.  (Tr. 71)

### 3.    The ALJ's Initial Findings, the Appeals Council Decision, and the Second Administrative Hearing

### a.    ALJ's First Decision

In the ALJ's first decision, the ALJ concluded that, prior to July 18, 2007, Davenport was not disabled. (Tr. 102)  In reaching this conclusion, the ALJ first considered the nature and severity of Davenport's physical impairments. (Tr. 92-94)  The ALJ determined that Davenport suffers from cervical and lumbar spine degenerative disc disease and asthma, and that both of these conditions qualify as severe impairments that significantly limit Davenport's ability to perform basic work activities.  (Tr. 93-94)

The ALJ further found that although Davenport's impairment was subjectively severe, there was insufficient objective evidence to meet the requirements of a listing in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 94-95)  Specifically, the ALJ found that Davenport did not meet the appendix requirements for any disorders of the spine or for any pulmonary disorders. (*Id.*)

The ALJ next evaluated the record and concluded that Davenport had the RFC to perform simple, unskilled sedentary work, that she could stand or walk for two hours a day, sit for six hours a day, lift ten pounds occasionally, occasionally climb stairs and ramps, occasionally balance, stoop or kneel, and that she should avoid concentrated exposure to temperature extremes, hazards, odors, dusts, gasses, fumes, and poor ventilation.  (Tr. 95)  In reaching this conclusion, the ALJ recounted Davenport's statements regarding her functional limitations.  (Tr. 96-97)  The ALJ then summarized the medical records relating to Davenport's asthma.  (Tr. 97) When analyzing Davenport's back problems, the ALJ concluded that Davenport's "disc disease

is not associated with the degree of treatment consistent with the severity alleged." (Tr. 97)

Specifically, the ALJ stated that the record "does not disclose significant or persistent findings"

that support Davenport's claims of "totally disabling pain" and functional limitations. (*Id.*) The

ALJ supported this finding by reference to statements made by Dr. Sugarman (Davenport's

neurosurgeon) indicating that Davenport's range of motion was "fairly good" and that her

condition was improving. (Tr. 97-98) However, the ALJ also referenced reports from Dr. Patil

(Davenport's neurologist) indicating that Davenport continued to complain of intractable and

severe back pain. (*Id.*)

The ALJ further recognized that both Drs. Sugarman and Patil concluded that Davenport

was permanently disabled and that Davenport would not be able to hold gainful employment.

(Tr. 99) The ALJ discounted these opinions, describing them as conclusory and as failing to "set

forth supportive findings or specific functional limitations." (Tr. 99) By contrast, the ALJ

assigned substantial weight to non-treating physician Dr. Kim's RFC opinion because "it is

supported by detailed clinical findings on physical examination" and "sets forth specific

functional restrictions and limitations." (Tr. 100) Likewise, the ALJ assigned considerable

weight to the opinions of Drs. Borek and Aldridge, because their assessments were "consistent

with the evidence of record and are based on familiarity with the Social Security Rules and

Regulations and occupational evaluations." (Tr. 100) Although the ALJ found that Davenport

was able to perform light work, the ALJ concluded that Davenport became disabled on July 18,

2007, when she turned fifty. (Tr. 100)

### b.    Appeals Council Decision and Second Administrative Hearing

Davenport appealed the ALJ decision, and on February 26, 2010, the Appeals Council

affirmed the ALJ's finding that Davenport was disabled on July 18, 2007. (Tr. 105) The

Appeals Council vacated the remainder of the decision and remanded the case for further action.

(*Id.*) The Appeals Council directed the ALJ to:

- "Obtain evidence from a medical expert to clarify the limiting effects of the claimant's asthma and whether the severity of the claimant's asthma meets or medically equals the criteria of Listing 3.02"

- "Give further consideration to the treating source opinion . . . and explain the weight given to such opinion evidence."

- "[G]ive further consideration to the claimant's maximum residual functional capacity and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations."

- "If warranted . . . obtain evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base."

(Tr. 106)

Subsequently, the ALJ held a second administrative hearing via video conference on

September 22, 2010. (Tr. 73) Although Davenport was present, she did not testify and did not

introduce any new evidence. (Tr. 76) The ALJ used the hearing to determine which exhibits

should be sent to the medical expert for use in the expert's assessment of Davenport's asthma.

(Tr. 78-79) Following the hearing, the ALJ sent Davenport's medical records, along with a series

of interrogatories, to Dr. Cruz. Dr. Cruz concluded that Davenport's asthma was not severe

enough to qualify for Listing 3.03. (Tr. 1023-42)

### c.    ALJ's Second Decision

On March 2, 2011, the ALJ issued a second decision. The second decision incorporated

by reference much of the discussion and evidence set forth in the ALJ's first decision. (Tr. 22)

The second decision focused only on whether Davenport was disabled prior to July 18, 2007. (*See* Tr. 25)  As in the first decision, the ALJ concluded that Davenport suffered from cervical and lumbar spine degenerative disease and asthma.  (*Id.*)  In accordance with the Appeals Council's remand order, the ALJ reconsidered whether Davenport's asthma met or equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Relying in large part on the opinion of Dr. Cruz, the ALJ concluded that Davenport's asthma did not meet or exceed a listing.  (Tr. 26)

Next, the ALJ revisited Davenport's RFC for the period prior to July 18, 2007.  After revisiting the statements and notes of Davenport's treating doctors, the ALJ readopted the RFC announced in the first decision.  In reaching this decision, the ALJ first considered Davenport's asthma.  The ALJ referred to a treatment note from 2002 indicating that Davenport's asthma had improved, a chest X-ray that "demonstrated no active process," and a 2007 physical exam showing that Davenport's chest was clear with no wheezes, rales, or rhonchi.  (Tr. 27)  The ALJ further noted that no other tests were conducted in the interim and concluded that the record does not reflect any exacerbations of asthma in that period.  (Tr. 27-28)

Turning to the opinions of Drs. Patil and Sugarman, the ALJ explained that treating source opinions are not necessarily entitled to controlling weight and outlined the factors used to assign weight to the opinion of a treating source.  (Tr. 29)  The ALJ justified the decision not to assign controlling weight to Dr. Patil by referencing the fact that Patil "did not recommend any further surgeries" and that "there were no significant changes or adjustments in dosages of the claimant's medications reflective of an uncontrolled condition."  (Tr. 29)  The ALJ further concluded that Dr. Patil's conclusions were inconsistent with the record, based on a report from

11

Dr. Sugarman stating that Davenport's condition improved following her cervical and lumbar surgeries.  (Tr. 29-30)

Because the ALJ's assessment of Davenport's RFC did not change, the ALJ decided not to obtain another opinion from a VE.  As before, the ALJ concluded that, prior to July 18, 2007, there were jobs that Davenport could have performed.  (Tr. 30)

Specifically, the ALJ found as follows:

> 1.　　The claimant meets the insured status requirements of the Social Security Act through September 30, 2004.

> 2.　　The claimant has not engaged in substantial gainful activity since March 15, 2003, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

> 3.　　Prior to July 18, 2007, the claimant had the following severe impairments: cervical and lumbar degenerative disc disease and asthma (20 CFR 404.1520(c) and 416.920(c)).

> 4.　　Prior to July 18, 2007, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520((d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

> 5.　　After careful consideration of the entire record, the undersigned finds that, prior to July 18, 2007, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) which was simple and unskilled in nature, with standing/walking two hours in an eight-hour workday, sitting six hours in an eight-hour workday, lifting 10 pounds occasionally, occasional climbing of ramps and stairs, no climbing of ropes, ladders, or scaffolds, occasional balancing, stopping, kneeling, crouching and crawling, frequent, rather than constant, reaching overhead and pushing and pulling with the upper extremities, and had to avoid concentrated exposure to temperature extremes, hazards, odors, dusts, gases, fumes, and poor ventilation.

6.      Prior to July 18, 2007, the claimant was unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.      The claimant was born on July 18, 1957 and was 45 years old, which is defined as a younger individual age 45-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.      Considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed prior to July 18, 2007 (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.      The claimant was not under a disability, as defined in the Social Security Act, prior to July 18, 2007 (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 25-31)

## III.    LEGAL STANDARDS

### A.    Motion for Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 & n.10 (1986). A party asserting that a fact cannot be – or, alternatively, is – genuinely disputed must support its assertion either by citing to "particular parts of materials in the record, including

depositions, documents, electronically stored information, affidavits or declarations, stipulations

(including those made for the purposes of the motions only), admissions, interrogatory answers,

or other materials," or by "showing that the materials cited do not establish the absence or pres-

ence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support

the fact." Fed. R. Civ. P. 56(c)(1). If the moving party has carried its burden, the nonmovant

must then "come forward with specific facts showing that there is a genuine issue for trial." *Mat-*

*sushita*, 475 U.S. at 587 (internal quotation marks omitted). The Court will "draw all reasonable

inferences in favor of the nonmoving party, and it may not make credibility determinations or

weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

To defeat a motion for summary judgment, the non-moving party must "do more than

simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475

U.S. at 586–87; *see also Podobnik v. U.S. Postal Service*, 409 F.3d 584, 594 (3d Cir. 2005)

(stating that party opposing summary judgment "must present more than just bare assertions,

conclusory allegations or suspicions to show existence of a genuine issue") (internal quotation

marks omitted). However, the "mere existence of *some* alleged factual dispute between the

parties will not defeat an otherwise properly supported motion for summary judgment."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A factual dispute is genuine only

where "the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Id*. at 248. "If the evidence is merely colorable, or is not significantly probative,

summary judgment may be granted." *Id.* at 249–50 (internal citations omitted); *see also Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (explaining that summary judgment is mandated

"against a party who fails to make a showing sufficient to establish the existence of an element

essential to that party's case, and on which that party will bear the burden of proof at trial").

## B.     Review of the ALJ's Findings

The Court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence." *See* 42 U.S.C. § 405(g); *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). "Substantial evidence" means less than a preponderance of the evidence but more than a mere scintilla of evidence. *See Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). As the United States Supreme Court has noted, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

In determining whether substantial evidence supports the Commissioner's findings, the Court may not undertake a *de novo* review of the Commissioner's decision and may not re-weigh the evidence of record. *See Monsour*, 806 F.2d at 1190. The Court's review is limited to the evidence that was actually presented to the ALJ. *See Matthews v. Apfel*, 239 F.3d 589, 593-95 (3d Cir. 2001). However, evidence that was not submitted to the ALJ can be considered by the Appeals Council or the District Court as a basis for remanding the matter to the Commissioner for further proceedings, pursuant to 42 U.S.C. § 405(g). *See id.* at 592. "Credibility determinations are the province of the ALJ and only should be disturbed on review if not supported by substantial evidence." *Gonzalez v. Astrue*, 537 F. Supp. 2d 644, 657 (D. Del. 2008).

The Third Circuit has explained that

> [a] single piece of evidence will not satisfy the substantiality test if

15

> the [Commissioner] ignores, or fails to resolve, a conflict created
> by countervailing evidence.  Nor is evidence substantial if it is
> overwhelmed by other evidence – particularly certain types of
> evidence (e.g., that offered by treating physicians) – or if it really
> constitutes not evidence but mere conclusion.

*Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983).

Thus, the inquiry is not whether the Court would have made the same determination, but is rather whether the Commissioner's conclusion was reasonable.  *See Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988).  Even if the reviewing Court would have decided the case differently, it must give deference to the ALJ and affirm the Commissioner's decision if it is supported by substantial evidence.  *See Monsour*, 806 F.2d at 1190-91.

**IV.   DISCUSSION**

**A.   Disability Determination Process**

Title II of the Social Security Act, 42 U.S.C. § 423(a)(1)(D), "provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from a physical or mental disability."  *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).  Title XVI of the Social Security Act provides for the payment of disability benefits to indigent persons under the SSI program.  42 U.S.C. § 1382(a).  A "disability" is defined for purposes of both DIB and SSI as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  *See* 42 U.S.C. § 423(d)(1)(A).  A claimant is disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial

gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

In determining whether a person is disabled, the Commissioner is required to perform a five-step sequential analysis. *See* 20 C.F.R. § 404.1520; *Plummer v. Apfel*, 186 F.3d 422, 427–28 (3d Cir. 1999). If a finding of disability or nondisability can be made at any point in the sequential process, the Commissioner will not review the claim further. *See* 20 C.F.R. § 404.1520(a)(4).

At step one, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity. *See* 20 C.F.R. § 404.1520(a)(4) (mandating finding of nondisability when claimant is engaged in substantial gainful activity). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant suffers from a severe impairment or a combination of impairments that is severe. *See id.* (mandating finding of nondisability when claimant's impairments are not severe). If the claimant's impairments are severe, the Commissioner, at step three, compares the claimant's impairments to a list of impairments that are presumed severe enough to preclude any gainful work. *See id.* When a claimant's impairment or its equivalent matches an impairment in the listing, the claimant is presumed disabled. *See id.* If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to steps four and five. *See id.*

At step four, the Commissioner determines whether the claimant retains the RFC to perform his past relevant work. *See id.* (stating that claimant is not disabled if claimant is able to return to past relevant work). A claimant's RFC is "that which [the] individual is still able to do despite the limitations caused by his or her impairment(s)." *Fargnoli v. Massanari*, 247 F.3d 34,

17

40 (3d Cir. 2001). "The claimant bears the burden of demonstrating an inability to return to her past relevant work." *Id.* at 39.

If the claimant is unable to return to her past relevant work, step five requires the Commissioner to determine whether the claimant's impairments preclude her from adjusting to any other available work. *See* 20 C.F.R. § 404.1520(a) (mandating finding of nondisability when claimant can adjust to other work). At this last step, the burden is on the Commissioner to show that the claimant is capable of performing other available work before denying disability benefits *See Plummer*, 186 F.3d at 428. In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and [RFC]." *Id.* In making this determination, the ALJ must analyze the cumulative effect of all of the claimant's impairments. *See id.* At this step, the ALJ often seeks the assistance of a VE. *See id.*

### B.    Plaintiff's Argument on Appeal

Davenport essentially presents three arguments in her appeal. She contends that the ALJ erred by: (1) failing to comply with the Appeals Council's remand order; (2) failing to comply with the treating physician doctrine, and therefore arriving at an unsubstantiated RFC; and (3) refusing to enforce a subpoena that was served on Dr. Nash.

### 1.    Compliance with the Appeals Council Order

Davenport argues that the ALJ's second opinion did not comply with the Appeals Council's remand order. (*See* D.I. 8 at 8-15 (faulting ALJ for incorporating analysis from her first decision and for failing to evaluate opinions of Davenport's treating physicians)) However,

as another Judge of this Court recently explained, "District Courts have the authority to review the final decisions of the Commissioner of Social Security, [but] [t]his authority does not extend to internal, agency-level proceedings." *Ford v. Colvin*, 2015 WL 4608136, at \*9 (D. Del. July 31, 2015) (internal quotation marks omitted); *see also Stoddard v. Astrue*, 2009 WL 2030349, at \*6 (C.D. Cal. July 8, 2009) ("The issues before the Court are whether the ALJ's final decision is supported by substantial evidence and is free of legal error, not whether the ALJ complied with the Appeals Council's remand order.") (internal citation omitted); *Scott v. Astrue*, 2007 WL 1725252, at \*8 (E.D. Pa. June 12, 2007) (determining that Court could not review whether ALJ complied with Appeals Council's remand order because Court's jurisdiction "extends only to the Commissioner of Social Security's final decision, which in this case is the ALJ's second decision, not the Appeals Council's remand").

Whether the ALJ adequately complied with the Appeals Council's remand order is an internal agency matter, not an issue for District Court review.  Notably, when Davenport appealed the ALJ's second decision, the Appeals Council denied her appeal.  Presumably, had the Appeals Council been persuaded that there was a material, prejudicial failure to comply with its earlier remand order, it would have provided appropriate relief.

Having disposed of Davenport's assertion of non-compliance with the Appeals Council remand order, the Court will turn to the issue of whether there is substantial evidence to support the ALJ's conclusion regarding Davenport's non-disability.

### 2.    Evaluation of Treating Physician Evidence and RFC

Davenport contends that the ALJ did not afford Davenport's treating physicians sufficient weight when evaluating their opinions.  (*See* D.I. 7 at 8-12)  The Court agrees and finds that, for

this reason, the ALJ's decision is not supported by substantial evidence.  In general, a treating physician's opinion is entitled to substantial weight.  *See Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 355-58 (3d Cir. 2008) ("An ALJ should give treating physicians' reports great weight, especially when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.") (internal quotation marks omitted). While an ALJ can discount the weight of a treating physician's opinion, the ALJ cannot do so "for no reason or for the wrong reason." *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999). Moreover, if the ALJ discounts the weight of a treating physician's opinion, the ALJ must explain why the ALJ is doing so.  *See id.*

Here, the ALJ discounted the opinion of at least two treating physicians and may have ignored the opinion of a third.  Specifically, the ALJ discounted the opinions of Drs. Sugarman and Patil.  (Tr. 29, 98-99)  From the time Davenport started treatment with Dr. Sugarman in September 2003, Dr. Sugarman consistently noted the presence of migraines, radiating pain, and severe back pains.  (Tr. 758-803)  From September 2003 through September 19, 2006, Dr. Sugarman noted the presence of significant pain on over a dozen occasions.  (*Id.*)  Dr. Sugarman further noted that Davenport was unable to hold even small objects.  (*Id.*)  The ALJ did not reference any of Dr. Sugarman's notes on these issues.  Instead, the ALJ quoted two of Dr. Sugarman's reports in which he observed an improvement in Davenport's condition.  (Tr. 98) The ALJ did not explain why weight was afforded to reports showing improvement, but not to reports demonstrating difficulty, hardship, or deterioration.

Similarly, the ALJ discounted the opinion of Davenport's neurologist, Dr. Patil.  Dr. Patil treated Davenport for approximately three years, from December 2002 through September 2005.

Throughout this period, Dr. Patil consistently remarked on the severity of Davenport's back pain. After nearly every appointment, Dr. Patil observed that Davenport had "severe intractable neck and lower back pain" (Tr. 584), that she "continue[d] to remain quite impaired from her injuries [and] has difficulty with all activities of daily living" (Tr. 575), or that she "continue[d] to suffer from severe, chronic and persistent neck and lower back pain" (Tr. 567). In his last report, Dr. Patil opined that Davenport "continues to have intractable neck, as well as lower back pain." (Tr. 555) He noted that, despite taking 240 mg of OxyContin daily, "[s]he still continues to have a significant amount of pain and discomfort." (*Id.*) Finally, Dr. Patil concluded that Davenport "clearly has chronic residuals from her injuries" and that she "is permanently disabled." (*Id.*)

Two years later, when Dr. Patil was asked to perform a functional capacity evaluation of Davenport, he found that, because of her pain, Davenport was unable to sit or stand for more than five minutes and that she had difficulty pushing, pulling, turning, and twisting. (Tr. 921) Dr. Patil concluded that, "[d]ue to the severity of her lower back condition, as well as the OxyContin . . . [Davenport] is not gainfully employable in any form of vocation. She is severely and chronically impaired." (*Id.*)

The ALJ provided three reasons why Dr. Patil's opinion was given only discounted weight: because Dr. Patil did not recommend any further surgeries, because Dr. Patil did not significantly change or adjust Davenport's medication, and because Dr. Sugarman observed improvements in Davenport's condition. (Tr. 29-30) None of these reasons, however, alone or in combination, provide substantial evidence that Davenport was not disabled. As Plaintiff states in her opening brief: "these are not inconsistencies. Not every pain requires increased dosages of narcotic drugs, and not every pain requires surgery." (D.I. 8 at 11)

21

The ALJ also failed to discuss the opinion of Davenport's chiropractor, Dr. Cozamanis, who treated Davenport from November 2002 through February 2004. After each of their monthly appointments, Dr. Cozamanis observed that Davenport was "totally disabled." (Tr. 529-39) It may be that the ALJ viewed this statement as conclusory, and therefore entitled to little or no weight, but this is not clear from the record.

By contrast, the ALJ placed heavy reliance on the assessments of non-treating physicians. For example, the ALJ gave "more weight" to the opinion of Dr. Kim, a consultative examiner who spent only about 10 minutes with Davenport. (Tr. 142-45, 978-88) Likewise, the ALJ "afford[ed] significant weight to the opinion of Dr. Cruz," a pulmonologist who reviewed Davenport's medical records. (Tr. 26)

In sum, the Court concludes that the ALJ's decision to assign reduced weight to three of Davenport's treating physicians, and to accord the weight she did to the non-treating physicians, is not supported by substantial evidence. While Defendant's briefing articulates reasons why the ALJ arguably could have assigned the relative weights she did to the various medical evidence in the record (*see* D.I. 13 at 23-24), there is no clear indication from the ALJ herself that this was, in fact, her analysis. Instead, it may merely be the post-hoc rationalization of counsel for the Commissioner. *See generally Fargnoli v. Massanari*, 247 F.3d 34, 44 n.7 (3d Cir. 2001) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.").

Because the ALJ's assessment of RFC is bound up with her evaluation of the medical evidence, the Court's conclusions about the weight given to the physicians' opinions also raise concerns as to whether the RFC is supported by substantial evidence. This is yet another reason

for a remand. (*Compare* D.I. 13 at 17-18 (describing substantial evidence that might support RFC finding) *with* Tr. 27-30 (ALJ's explanation of RFC finding))

Under the circumstances – which include a remand from the Appeals Council directing that "[f]urther evaluation of Dr. Patil's medical opinion is required" and indicating that "[f]urther proceedings, including testimony from a medical expert, are necessary to determine the limiting effects of the claimant's asthma" (Tr. 105-06) – the Court will remand this matter to the Commissioner. While Defendant insists that any failings in the ALJ's second decision are harmless errors of opinion drafting,[1] the Court believes the circumstances here merit further review by the Commissioner. Such review might lead to a different result. Accordingly, the Court will grant Davenport's motion for summary judgment, deny the Commissioner's motion for summary judgment, and remand this matter to the Commissioner.

### 3.     Whether the ALJ Erred in Failing to Enforce Subpoena

Davenport also faults the ALJ for failing to enforce either of the two subpoenas the ALJ issued to Dr. Nash, a pulmonologist who had treated Davenport. (*See* D.I. 7 at 16-17) The ALJ issued the subpoenas at Davenport's request. (Tr. 22) In response to the first subpoena, the ALJ was advised that Dr. Nash was no longer affiliated with the entity at which he had worked at the time he treated Davenport and that this entity had no record of Davenport being its patient. (Tr. 22) There was no response to the second subpoena (which was served on an entity believed to be

---

[1](*See* D.I. 13 at 25) (citing and quoting *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1999) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result."), and *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996) ("An arguable deficiency in opinion-writing technique is not a sufficient reason for setting aside an administrative finding where . . . the deficiency probably had no practical effect on the outcome of the case.")

Dr. Nash's more recent employer).  (Tr. 22)  Over Plaintiff's objection, the ALJ closed the record

without enforcing either of the two subpoenas.  (Tr. 22-23)[2]

Issues surrounding enforcement of an agency subpoena may well be issues of intra-

agency procedure that are not subject to review by a District Court in the context of a social

security appeal.  This is not a point either side addresses.  In any event, given that the Court is

remanding this matter to the Commissioner, it will be for the Commissioner to determine what, if

any, additional evidence should be sought and what evidence-gathering techniques should be

employed.

## V.    CONCLUSION

For the foregoing reasons, the Court will grant Plaintiff's motion for summary judgment

and deny Defendant's motion for summary judgment.  This matter will be remanded to the

Commissioner for further proceedings.  An appropriate Order will be entered.

---

[2]The ALJ found that "[t]here [was] no indication that the [desired records] . . . exist[ed]"
and concluded that the requested studies would have little probative value because they "were
conducted prior to the . . . alleged onset of disability" and the record already contained a
summary of the studies.  (Tr. 23)